IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JOHN R. and CHARLES R., | |
| Plaintiffs, | ORDER AND MEMORANDUM DECISION |
| vs. | Case No. 2:18-cv-35-TC-DAO |
| UNITED BEHAVIORAL HEALTH and THE GUARDIAN CHOICE PLUS POS PLAN FOR HOME OFFICE EMPLOYEES, | |
| Defendants. | |

Throughout the years 2014 to 2016, Plaintiff Charles R. ("Charlie") received mental health and substance abuse treatment from three behavioral health providers while he was a teenager. At the time, Charlie's father, Plaintiff John R., had health insurance coverage through his employer. Because Charlie was a beneficiary of his father's health insurance plan, his parents submitted claims for coverage of his treatment. After the insurance company denied those claims (as well as administrative appeals of those denials), Plaintiffs filed this suit seeking coverage under ERISA.[1]

The parties have filed cross-motions for summary judgment based on the administrative record. For the reasons set forth below, the court affirms the denial of Plaintiffs' claims.

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

## BACKGROUND[2]

During Charlie's treatment, John R., as an employee of Guardian Life Insurance Company of America, was enrolled in the Guardian Choice Plus POS Plan for Home Office Employees (the Plan),[3] which provided health insurance to John and Charlie.  ERISA governs the Plan.

Before Charlie started the treatment at issue in this case, he had a significant history of problems with learning disabilities, mental health issues, and substance abuse.  He has been diagnosed with a series of disorders, including anxiety, ADHD, oppositional defiance disorder (ODD), and cannabis use disorder.  In other words, he has a "dual diagnosis."

In September 2013, Charlie began seeing Patrick Cole, LCSW, who diagnosed Charlie with "severe emotion regulation problems, severe impulsivity, lack of empathy, frequent irritability, anger/rage episodes, and … significant problems with motivation."  (Am. Compl. ¶ 16, ECF No. 20.)  In June 2014, Charlie stopped seeing Mr. Cole, and, according to Plaintiffs, his behavioral problems "became more severe."  (Id. ¶ 18.)

At that point, his parents enrolled him in a full-time outdoor-based treatment program at Summit Achievement (Summit) in Maine, where he spent approximately two months.  During Charlie's stay at Summit, Greg Carbone, Ph.D., who has no apparent affiliation with Summit, conducted neuropsychological tests on Charlie, and on August 20, 2014, he issued his Report of Neuropsychological Evaluation ("2014 Psychological Report" (AR 5006–23)).  In that document, he provided recommendations for how to handle Charlie's treatment after Charlie left

---

[2] The court draws facts from the sealed administrative record ("AR") (ECF No. 52), and, on occasion, cites unchallenged allegations in the complaint to provide background.
[3] Because Charlie's treatment spanned three years, three different Plan documents govern.  Their terms are essentially the same, so for the sake of simplicity, the court refers to them as the Plan.

Summit.

Upon Charlie's discharge from Summit, his parents sent him to boarding school. Unfortunately, the school expelled Charlie, and he subsequently enrolled in a program provided by Second Nature Blue Ridge Wilderness Therapy (Second Nature), located in Georgia. He stayed at Second Nature for approximately two and a half months in 2015.

Just days after he left Second Nature, his parents admitted him to the full-time outdoor-based treatment program at In Balance Ranch Academy (Ranch Academy) in Arizona. He spent about a year and a half there, from March 2015 to August 2016.

Charlie's parents submitted claims to the Plan for coverage of Charlie's treatment in each of those programs. UnitedHealthcare (UHC), the Plan's Claims Administrator, denied those requests through United Behavioral Health (UBH), the Plan's Mental Health/Substance Use Disorder Administrator. UBH's reasons for denial varied for each set of claims. UBH cited procedural deficiencies, including timeliness, when it denied the Summit and In Balance Ranch Academy claims. In its denial of the Second Nature claim, UBH based its decision on the physician reviewers' assessment of the treatment's medical necessity. Plaintiffs are appealing all three denials.

## THE PLAN LANGUAGE

### 1. Benefits for "Covered Health Services"

The Plan provides benefits for any "Covered Health Service," defined as services UHC determines to be:

- Medically Necessary;

- Included in Sections 5 and 6, Plan Highlights and Additional Coverage Details described as a Covered Health Service;

- Provided to a Covered Person who meets the Plan's eligibility requirements, as described under Eligibility in Section 2, Introduction; and

• Not identified in Section 8, Exclusions.

(AR 105, 230, 356.)  "Medically Necessary" health care services are those:

> provided for the purpose of preventing, evaluating, diagnosing or treating a
> Sickness, Injury, Mental Illness, substance use disorder, condition, disease or its
> symptoms, [and] that are all of the following as determined by UnitedHealthcare
> or its designee, within UnitedHealthcare's sole discretion …:
>
> • In accordance with Generally Accepted Standards of Medical Practice;
>
> • Clinically appropriate, in terms of type, frequency, extent, site and duration,
>   and considered effective for your Sickness, Injury, Mental Illness, substance
>   use disorder disease or its symptoms;
>
> • Not mainly for your convenience or that of your doctor or other health care
>   provider;
>
> • Not more costly than an alternative drug, service(s) or supply that is at least as
>   likely to produce equivalent therapeutic or diagnostic results as to the diagnosis
>   or treatment of your Sickness, Injury, disease or symptoms.

(AR 108, 233, 359 (emphasis added)).

Although the Plan covers treatment of mental health and substance use disorders, it

expressly excludes "Benefits for Mental Health/Substance Use" services or treatments where, "in

the reasonable judgment" of UHC, the service or treatment is:

> • Not consistent with generally accepted standards of medical practice for the
>   treatment of such conditions;
>
> • Not consistent with services backed by credible research soundly demonstrating
>   that the services or supplies will have a measurable and beneficial health
>   outcome, and therefore considered experimental;
>
> • Not consistent with the Mental Health/Substance Use Disorder Administrator's
>   level of care guidelines or best practices as modified from time to time; or
>
> • Not clinically appropriate for the patient's Mental Illness, Substance Use
>   Disorder or condition based on generally accepted standards of medical practice
>   and benchmarks.

(AR 58, 187–88, 314.)  The "Mental Health/Substance Use Disorder Administrator's level of

care guidelines" cited above play a significant role in Plaintiffs' appeal.  As discussed below,

4

Plaintiffs challenge UBH's reliance on the criteria set forth in the Plan's Level of Care (LOC) Guideline for Residential Substance Use Disorder Treatment (hereinafter "Substance Use Disorder Guideline").

### 2. Claim Filing Deadlines

Summit, Second Nature, and In Balance Ranch Academy are all out-of-network providers.  In the Plan's section titled "How to File a Claim," it states that in order to obtain coverage for services from an out-of-network provider, the Plan member (in this case, John R.) is responsible for seeking coverage: "When you receive Covered Health Services of an Out-of-Network provider, you are responsible for requesting payment from the Plan."  (AR 72, 202, 328.)  The Plan document also unambiguously provides that the Plan member is responsible for the timeliness of that request, whether the claim is submitted by the Plan member or by the out-of-network provider on the member's behalf.  (Id.)  It then unequivocally notifies the Plan member of that deadline: **"You must submit a request for payment of Benefits within one year after the date of service."**  (Id. (emphasis in original).)

If the Plan member does not follow that rule, UHC may reduce or deny coverage in its sole discretion.  The Plan allows one exception, which Plaintiffs raise in their appeals: the one-year deadline for submitting claims does not apply when the Plan member is legally incapacitated.

### 3. Appeals of Denials

If UBH denies a claim, the Plan member may file an initial appeal (a "level one" appeal), but must do so no later than 180 days from the denial date.  The 2015 and 2016 Plans also provide a "level two" internal appeal.  When the Plan member has exhausted his internal appeals, he may file a request for an independent external review.  (AR 76, 206, 332.)  The external

reviewer "will review the claim anew and not be bound by any decisions or conclusions reached by" the internal reviewers.  (AR 78, 208, 334.)

**STANDARD OF REVIEW**

Plaintiffs contend that (1) the court must give no deference to UBH's denials because UBH violated ERISA's procedures when it made its decisions, and (2) the court, applying that de novo standard of review, should find all of Charlie's treatment medically necessary.

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989);  Foster v. PPG Indus., Inc., 693 F.3d 1226, 1231 (10th Cir. 2012).  If the plan delegates that authority, the court applies the "arbitrary and capricious" standard of review.  Met. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008); Firestone, 489 U.S. at 115.

Under that standard, the court must give deference to claim determinations and affirm if the decisions were "reasonable and made in good faith."  Hickman v. GEM Ins. Co., 299 F.3d 1208, 1213 (10th Cir. 2002).  A claim decision is reasonable if it is supported by substantial evidence in the administrative record.  Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992).  "Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion. Substantial evidence means more than a scintilla, of course, yet less than a preponderance."  Adamson v. UNUM Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006) (citing Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002); Sandoval, 967 F.2d at 382).  Given that high level of deference, a plan interpretation or decision having "any reasonable basis will be upheld; it need not be the only logical or even the

best decision." <u>Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan</u>, 11 F.3d 1567, 1570 (10th Cir. 1993); <u>see also</u> <u>Woolsey v. Marion Labs., Inc.</u>, 934 F.2d 1452, 1460 (10th Cir. 1991) (the court "will not substitute [its] judgment for the judgment of the [administrator] unless the actions of the [administrator] are not grounded on any reasonable basis").

Here, the Plan delegates to the Claims Administrator, UHC, the discretionary authority to administer the terms of the Plan, including the "exclusive right to determine all claims for benefits under the Plan" and to construe Plan terms.  (See e.g., AR 72, 202.)  In turn, the Plan gives UHC authority to delegate administration of mental health and substance abuse claims to a Mental Health/Substance Use Disorder Administrator, in this case UBH.  With that delegation, the deferential arbitrary and capricious standard applies here.  <u>Nance v. Sun Life Assurance Co. of Canada</u>, 294 F.3d 1263, 1266 (10th Cir. 2002).

Plaintiffs claim Defendants have forfeited that deference because the record shows serious procedural irregularities in the Defendants' handling of Plaintiffs' claims.  If such irregularities exist, a plaintiff is entitled to de novo review of the decision.  <u>Martinez v. Plumbers & Pipefitters Nat'l Pension Plan</u>, 795 F.3d 1211, 1215 (10th Cir. 2015).  Under that standard, the court gives no deference to the administrator's claim decision and independently determines whether the claims administrator made the correct decision.  <u>Niles v. Am. Airlines, Inc.</u>, 269 F. App'x 827, 832–33 (10th Cir. 2008) (citing <u>Hoover v. Provident Life & Accident Ins. Co.</u>, 290 F.3d 801, 808–09 (6th Cir. 2002)).

Defendants deny they violated ERISA's procedures.  But they also note that the court must give the decision deference if the administrator substantially complied with ERISA's regulations.  <u>Gilbertson v. Allied Signal, Inc.</u>, 328 F.3d 625, 634–35 (10th Cir. 2003).

As discussed in more detail below, the court finds the record does not show serious procedural irregularities.  Accordingly, for each of the three sets of claims, the court applies the arbitrary and capricious standard of review.

## SUMMIT ACHIEVEMENT

On June 24, 2014, Charlie's parents sent him to Summit based on a recommendation and referral from Robert Meltzer, an educational consultant, and Patrick Cole, LCSW.  Summit provides an around-the-clock outdoor-based treatment program.  Charlie spent approximately two months at Summit before he was discharged on September 2, 2014.

Plaintiffs filed their claim for coverage on January 5, 2016.  On January 8, 2016, UBH denied the claim because Plaintiffs filed their request for coverage after the one-year deadline for claim submission had passed.

UBH relied on the Plan's requirement that the Plan member request payment for services of an out-of-network provider, such as Summit, no later than one year after discharge.  Charlie left Summit on September 2, 2014, which meant Plaintiffs had to file their claim no later than September 2, 2015.  Plaintiffs filed their claim four months late.

After the denial, Plaintiffs filed an appeal on May 19, 2016.[4]  In their appeal letter, Plaintiffs relied on the Plan's exception that the "time limit does not apply if you are legally incapacitated."[5] (AR 202.)  The Plan does not define "legally incapacitated," so Plaintiffs provided their own definition and explained why they believed they were entitled to the

---

[4] Plaintiffs now submit two letters they wrote to the Plan Administrator requesting reversal of UBH's decision.  (See Exs. A & B to Pls.' Opp'n to Defs.' Mot. Summ. J., ECF Nos. 59-1 and 59-2.)  The letters are not part of the administrative record, so the court will not consider them. (See March 31, 2020 Scheduling Order, ECF No. 41 (setting April 16, 2020 deadline for objecting to scope of administrative record).)

[5] They alternatively asked UBH to waive the timely-filing requirement and conduct a retrospective review of Charlie's claims, a request UBH denied.

exception:

> [O]ne is considered "legally incapacitated" if they do not have the legal capacity to make their own decisions. This includes someone with a mental illness, which is typically defined as a condition that disrupts a person's thinking, feeling, mood, ability to relate to others, and their daily functioning. Since Charlie was treated for a number of mental health conditions while he was at Summit Achievement, he was "legally incapacitated" and the plan's timely filing limit should not apply to his claims for Summit Achievement.

(AR 5162.) Plaintiffs did not cite the source for their definition. On September 22, 2016, UBH

upheld the denial for the same reason.[6]

In the papers before this court, UBH offers its own definition, which it drew from the

Utah Uniform Probate Code:

> "Incapacitated" or "incapacity" is measured by functional limitations and means a judicial determination after proof by clear and convincing evidence that an adult's ability to do the following is impaired to the extent that the individual lacks the ability, even with appropriate technological assistance, to meet the essential requirements for financial protection or physical health, safety, or self-care:
>
> > (a) receive and evaluate information;
> >
> > (b) make and communicate decisions; or
> >
> > (c) provide for necessities such as food, shelter, clothing, health care, or safety.

Utah Code Ann. § 775-1-201(22). Another legal source—Black's Law Dictionary—defines a

"legally incapacitated person" as "[a] person, other than a minor, who is temporarily or

permanently impaired by mental illness, mental deficiency, physical illness or disability, or

alcohol or drug use to the extent that the person lacks sufficient understanding to make or

---

[6] Even though the 2014 Plan does not provide more than one internal appeal, Plaintiffs submitted a "level two member appeal" on January 11, 2017. UBH rejected the appeal as untimely. Plaintiffs assert that UBH should have considered their appeal because UBH gave them an incorrect deadline. Plaintiffs' argument is beside the point. The Plan does not offer a second-level appeal, so even if Plaintiffs filed a timely appeal letter, UBH was not obligated to consider it.

communicate responsible personal decisions or to enter into contracts." "Legally-Incapacitated Person," Black's Law Dictionary (11th ed. 2019).

Plaintiffs' argument is not persuasive under any of the definitions. Charlie's circumstances and his treatment "for a number of mental health conditions while he was at Summit" (as Plaintiffs asserted in their appeal letter), do not suggest he could not understand or make decisions about his needs during his treatment at Summit. Nor does the record show that Charlie was legally incapacitated at any time after he left Summit. Moreover, it is clear that Charlie's parents, not Charlie, were handling claims for his treatment. The record does not support a finding that anyone—whether it be Charlie,[7] his father,[8] or his mother—was legally incapacitated during the relevant times.

The Plan clearly articulated Plaintiffs' obligation to request coverage of treatment by an out-of-network provider, like Summit, within one year. They did not meet their obligation, and without benefit of the Plan's sole exception to the rule, Plaintiffs have no reasonable basis for requiring UBH to allow claims submitted after September 2, 2015.

UBH's decision is wholly supported by the record under both standards of review. Accordingly, the court denies Plaintiffs' request for coverage of costs they incurred for Charlie's treatment at Summit.

---

[7] Neither the administrative record nor the briefing discuss whether the definition would apply to Charlie as a minor.

[8] Arguably, the exception only applies to the Plan member, for that is who must file the claim for treatment by an out-of-network provider. The Plan says, "You [the Plan member] must submit a request for payment of Benefits within one year after the date of service. … If you don't provide this information to us within one year of the date of service, Benefits for that service will be denied or reduced, in the Claims Administrator's discretion. This time limit does not apply if you are legally incapacitated." (AR 72, 202, 328.) Here, Charlie's father was the Plan member.

## **SECOND NATURE**

After Charlie left Summit, he enrolled in a boarding school.  But in January 2015, after Charlie had numerous problems at school, including the school's discovery that he had used an LSD-like substance while under its care, the school expelled him so he could seek substance abuse treatment.

He then enrolled in Second Nature, an out-of-network provider offering around-the-clock treatment in a wilderness-oriented program.  Charlie stayed there for approximately two and a half months (from January 12, 2015, to March 25, 2015).

During his stay, Charlie's treating clinician Lu Vaughn, LPC NCC, diagnosed Charlie with severe cannabis use disorder, in a controlled environment; severe ADHD; parent-child relational problem; and moderate oppositional defiant disorder.  (AR 4556.)  During treatment, Charlie "made progress in accepting limits, managing his emotions, and displaying appropriate communication and social interactions."  (AR 4559.)  He also made progress during substance abuse treatment.  According to Vaughn, Charlie was "proud of his realization that he was able to 'have fun' and make meaningful connections with others in the context of a sober lifestyle." (Id.)

Nevertheless, Vaughn concluded that Charlie remained "highly susceptible to external pressures," and was at risk of relapse.  (Id.)  Vaughn recommended that upon discharge from Second Nature, Charlie receive continued treatment at "a residential or therapeutic boarding school … so he can practice and internalize the skills and tools he learned at Second Nature." (Id.)  Indeed, after Second Nature discharged Charlie on March 25, 2015, Charlie's parents sent

him to the residential treatment program at In Balance Ranch Academy on March 28, 2015.

**UBH's Denial of Coverage**

    **a. Retrospective Review**

In February 2016, UBH Medical Director Leslie Moldauer, MD, Board Certified in Psychiatry, conducted a retrospective review of Charlie's treatment at Second Nature. As part of that review, Dr. Moldauer wrote in UBH's internal case notes that "[t]he progress notes are unremarkable and reflect a standard program attendance at a facility such as this one." (AR 536.) Dr. Moldauer noted that Charlie "had a history of cannabis use, ADHD and mood problems. He got kicked out of a boarding school because of cannabis use. The treatment has a wilderness orientation."[9] (Id.)

According to Dr. Moldauer, Charlie was "compliant with treatment. He did not have any emotional dysregulation or behavior problems. He was not dangerous to self or others. He did not require[] 24-hour per day monitoring and could have been treated at a lower level of care." (AR 537.) Because Dr. Moldauer determined that "[t]here are insufficient clinical data to support medical necessity for SUBSTANCE USE DISORDER RESIDENTIAL TREATMENT services from 1/12/2015-3/25/15," Dr. Moldauer found that Charlie's treatment at Second Nature was not medically necessary: "Care could have taken place in the intensive outpatient level of care." (Id.)

On March 1, 2016, UBH sent a letter to Plaintiffs articulating Dr. Moldauer's rationale:

> You were admitted to residential treatment on 01/12/2015. At that time you were having problems with cannabis and were having trouble in school. In treatment you did not have withdrawal symptoms. Your behavior was good. You were engaged in treatment. You did not require 24-hour per day monitoring and you could have been treated at a lower level of care.
>
> Based on our Level of Care Guideline for Residential Substance Use Disorder

---

[9] Plaintiffs clarify that the school expelled Charlie for using an hallucinogen.

Treatment, it is my determination that no authorization can be provided
01/12/2015 – 03/25/2015.

(AR 4541.)

### b.  Level One Appeal

On August 17, 2016, Plaintiffs filed a level one appeal of that decision.  In their letter,
they asserted the treatment was medically necessary, and, in support, they attached a copy of
Charlie's medical records from Second Nature, including a Master Treatment Plan, and Greg
Carbone's 2014 Psychological Report.  Charlie's mother, who wrote the letter, requested "a full,
fair and thorough level one member appeal review …. If denial is maintained, I request that you
provide me with your specific detailed reasons for denying these claims."  (AR 4549.)

UBH upheld the initial denial on November 2, 2016.  The reviewer, Associate Medical
Director Neal Satten, MD, noted that at the time Charlie was admitted to Second Nature, Charlie
"was having problems with using cannabis and was having trouble at school."  (AR 4860.)  Dr.
Satten then explained his rationale for the denial: "In treatment your child did not have
withdrawal symptoms.  Your child's behavior was good.  Your child was engaged in treatment.
Your child did not require 24-hour per day monitoring and he could have been treated at a lower
level of care."  (Id.)  Plaintiffs appealed that decision.

### c.  Level Two Appeal

In their level two appeal letter, dated December 28, 2016, Plaintiffs argued that Dr. Satten
incorrectly determined Charlie's treatment at Second Nature was not medically necessary.
Charlie's mother asserted various reasons why UBH should have reversed Dr. Satten's decision:

(1) Dr. Satten ignored Charlie's dual diagnosis of a mental health disorder (for example,
    ADHD and ODD) and a substance use disorder (cannabis use disorder);

(2) Dr. Satten made light of Charlie's serious educational and behavioral struggles in

13

school and at home;

 (3) Despite the findings and recommendations of Charlie's psychologist and

therapists, Dr. Satten concluded, incorrectly, that Charlie did not require 24-

hour per day monitoring.

(4) Charlie's good behavior and positive response to treatment were not valid bases to

deny coverage;

(5) Dr. Satten improperly applied the LOC guideline criteria;

(6) Dr. Satten failed to cite to the clinical records upon which he relied to reach his

decision.

Along with her letter, Charlie's mother submitted a copy of Charlie's medical records,

the 2014 Psychological Report, and three letters of medical necessity.  Two of those letters were

drafted by Charlie's therapists (Patrick Cole and William J. Strong, LCSW), and the third was

drafted by educational consultant Robert Meltzer.

UBH upheld the denial on January 26, 2017.  Associate Medical Director Lawrence

Goldberg, MD, reviewed documents from Plaintiffs' level one appeal, UBH case notes, and

Charlie's medical records.  He concluded that "[m]edical necessity is not met for the substance

use residential level of care …. Wilderness program[s] such as [Second Nature] do not meet our

guidelines for adequate medical oversight, and are geared toward experiential and psychosocial

growth experiences rather than medically directed treatment."  (AR 5064.)

In all of UBH's denial letters, the reviewers noted that UBH had approved coverage of

services at the Intensive Outpatient Treatment level of care.  (See AR 546, 4542, 4860.)

### d.  Independent External Review

On June 23, 2017, Plaintiffs requested an independent external review of the denial.

14

UBH sent the appeal to a company called MCMC.  Charlie's mother wrote a thirteen-page letter in support, to which she attached a copy of her level one and level two appeal documents (which included Charlie's Second Nature medical records) and the three letters of medical necessity she had relied upon in her earlier appeals.

She began her appeal by contending Dr. Goldberg erred because he did not consider Charlie's dual diagnosis.  "As [Charlie] grapples with both substance use and mental health issues, the purpose of Charlie's outdoor behavioral health treatment was not just to provide therapy for substance use disorder—*it was to provide therapy for his struggles with mental health issues as well*."  (AR 5080 (emphasis in original).)

Then, after detailing the educational, behavioral, and physical problems Charlie experienced before attending the Second Nature program, she insisted that

> [w]hile Charlie's behavior improved while at Second Nature, and it appeared he was making some progress in treatment, such observations should not be considered eliminating factors when determining medical necessity of 24/7 intermediate therapy, but instead, should be considered signs of effective treatment[.]

(AR 5081.)  In support, she quoted Charlie's Discharge Summary extensively, and, drawing from that, wrote,

> It is clear from this report that even though Charlie was able to make some progress during his time at Second Nature, there were still moments when he struggled to manage his behavior, and when staff had to work with him to restore appropriate behavior.  As noted [in the Discharge Summary], he still needed further therapy to address his anger and defiance issues after discharging from intermediate treatment.

(AR 5082.)

As she had done in her past appeals, she cited the 2014 Psychological Report, in which Dr. Carbone wrote that he

> expected [Charlie to] require continued structure and support for an extended period, both of which should be tailored to his learning profile and implemented

15

by a professional staff with experience in helping adolescents who present with the combinations of academic, neurocognitive, social, and behavioral difficulties outlined here.

Continuing sobriety will be critical to Charlie's progress, so that immediate intervention into his cannabis use should be prioritized and access to drugs and alcohol essentially non-existent for him for the foreseeable future.  Consistent with this, mechanisms to prevent any relapse should remain in place for an extended period in order to ensure continued sobriety and therapeutic gains.

(AR 5083.)  She then listed the admission criteria from the LOC guideline Dr. Goldberg used—the Substance Use Disorder Guideline—and concluded that Charlie did in fact satisfy those criteria.

She also took issue with Dr. Goldberg's characterization of Second Nature as a wilderness program "geared toward experiential and psychosocial growth experiences rather than medically directed treatment."  (AR 5064, 5085.)  She submitted "all of the literature [her] healthcare advocates [had] gathered concerning intermediate outdoor behavioral treatment programs[.]"  (AR 5086.)

On August 31, 2017, the independent external reviewer, who is board certified in psychiatry with a sub-certification in child and adolescent psychiatry, upheld UBH's decision on the ground that the treatment was not medically necessary.  The MCMC reviewer relied on "[i]ntake information, discharge summary and treatment planning, as well as status update program records," the 2014 Psychological Report, "[a]ppeal information, denial letter, correspondence, submitted medical records, program records, utilization review records, and the Summary Plan Description."  (AR 5095.)  Citing to Charlie's appeal letter, the reviewer also acknowledged Charlie's dual diagnosis of cannabis use disorder, ADHD, and ODD.  (AR 5095, 5097.)

In the denial, the MCMC reviewer concluded that Second Nature's treatment of Charlie

16

was

> not [] consistent with generally accepted standards of medical practice, and not
> consistent with research soundly showing measurable and beneficial health
> outcome. … [The requested health service] is not clinically appropriate in terms
> of site and duration and intensity, and there are less intensive options that are at
> least as safe and effective.

(AR 5095–96.)  The letter briefly described the elements and nature of Charlie's treatment.

> The patient's problems included oppositionality, defiance, noncompliance, anger
> and negative expressed emotions.  Records from the program indicate that the
> patient was compliant with the treatment milieu, activities and protocols.  The
> program records indicate that the patient required work around anger and blame
> externalization.  He also worked on substance use issues.  The treatment was
> wilderness therapy.

(AR 5095.)  The reviewer then reasoned that Charlie

> could have received the treatment on an outpatient basis such as with an intensive
> outpatient program (IOP).  The patient could have been referred to probate court
> services since oppositional defiance and anger at authority were significant
> factors. Getting probate court oversight with the ability to utilize mandated toxic
> screens and oversight of compliance in conjunction with school based services
> and mental health services is a known and effective community based treatment
> option.  The patient could have been suspended from the school and asked to
> complete an outpatient program and submit toxic screens upon a reapplication for
> admission.  The choice to send him to a wilderness program was a decision of
> personal preference and based on educational consultation advice and not made
> based on medical necessity criteria.

(AR 5096.)  In conclusion, the external reviewer cited to nine professional references and

publications concerning standards of treatment and care of adolescents with mental health and

substance use disorders.

Once the external reviewer issued the final binding decision, Plaintiffs had exhausted their

administrative remedies.

## **Standard of Review**

Plaintiffs assert that procedural irregularities during the appeal process justify de novo

review.  They say (i) UBH failed to consider Charlie's dual diagnosis when it applied the Plan's

Substance Use Disorder Guideline to the exclusion of criteria in UBH's mental health disorder

LOC guideline; (ii) UBH did not provide the meaningful dialogue that ERISA regulations

require; and (iii) UBH provided a new basis for denial in its response to Plaintiffs' level two

appeal.  For the reasons set forth below, the court finds that Defendants substantially complied

with ERISA's procedural requirements.  Accordingly, the court applies the deferential arbitrary

and capricious standard of review.

### a. Dual Diagnosis

According to Plaintiffs, UBH abused its discretion because it based its decision strictly on

the Plan's Substance Use Disorder Guideline and gave no thought to Charlie's mental health

problems under the Plan's LOC guideline addressing mental health disorders.[10]  The record does

not support Plaintiffs' contention.  Instead, it shows that the reviewers did consider Charlie's

dual diagnosis.

In the case notes, the UBH reviewers refer to Charlie's cannabis use, ADHD, parent/child

relational problem, and ODD.  (See AR 504–06 (Moldauer), 509–10 (Satten).)  In addition, the

admission criteria upon which the UBH reviewers relied, which are listed in the Substance Use

Disorder Guideline, require consideration of factors underlying a dual diagnosis:

> 1.3 The "why now" factors leading to admission and/or the member's history of
> response to treatment suggest that there is imminent or current risk of relapse

---

[10] Plaintiffs urge the court to follow the lead of an unreported decision issued by a Northern
District of California court in a class action against UBH.  See Wit v. United Behavioral Health,
No. 14-cv-02346-JCS, 2020 WL 6479273 (N.D. Cal. Nov. 3, 2020), appeal docketed, No. 20-
173363 (9th Cir. Dec. 3, 2020).  In Wit, the court found that the LOC guidelines UBH applies to
evaluate a claimant's mental health and substance abuse treatment were inconsistent with
generally accepted standards of care.  See id. at *48–*49.  Plaintiffs acknowledge Wit is not
binding on this court, but they assert that the Wit findings, "while not precedential[,] are
persuasive."  (Pls.' Opp'n to Defs.' Mot. Summ. J. at 31–32, ECF No. 59.)  They then ask the
court to evaluate their claims by following "generally accepted standards of care as required by
the plan document and as outlined in Wit."  (Id.)  The court declines to do so.  Wit is not binding,
and the complex issues the parties raise in Wit are not before this court.

which cannot be safely, efficiently, and effectively managed in a less intensive
level of care.  Examples include:

> 1.3.1. <u>A co-occurring mental health condition</u> is stabilizing but the
> remaining signs and symptoms are likely to undermine treatment in a less
> intensive setting.

(AR 500-01 (emphasis added).)  That guideline also requires the reviewer to consider the

patient's treatment history:

> 1.3.2. The member is in immediate or imminent danger of relapse, and <u>the
> history of treatment</u> suggests that the structure and support provided in this level
> of care is needed to control the recurrence.

(<u>Id.</u> (emphasis added).)  In Charlie's case, his treatment history included treatment for both

mental health and substance abuse issues.

The external reviewer also considered Charlie's dual diagnosis.  For instance, the MCMC

decision acknowledges Charlie's treatment for cannabis use disorder, ADHD, and ODD, and

discusses Charlie's emotional and behavioral problems as well.  (<u>See</u> AR 5095–96.)

In short, the record does not support Plaintiffs' contention that UBH failed to consider

Charlie's dual diagnosis in its review of Charlie's treatment at Second Nature.

### b.  Meaningful Dialogue

Citing to ERISA regulations, Plaintiffs say UBH violated procedural requirements

because it did not engage in a meaningful dialogue.  They contend UBH did not (1) take into

account all of the information Plaintiffs provided on appeal; (2) provide a specific reason for its

denial; (3) explain the reviewers' clinical judgment in the context of the Plan's requirements and

Charlie's circumstances; or (4) disclose its reviewers' qualifications. The court disagrees.

ERISA regulations impose a number of procedural requirements on UBH.  As part of

ERISA's requirement that a claimant receive a full and fair review on appeal, UBH must

"[p]rovide for a review that takes into account all comments, documents, records, and other

19

information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv) (2020). A claim denial must, among other things, provide the specific reasons for the adverse determination. Id. § 2560.503-1(g)(1)(i). And a denial of a claim based on lack of medical necessity requires "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances[.]" Id. § 2560.503-1(g)(v)(B). Finally, when UBH denies a claim based on medical judgment, it must show that it "consult[ed] with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment" and "[p]rovide for the identification of medical or vocational experts whose advice was obtained…." Id. § 2560.503-1(h)(3)(iii)-(iv). UBH substantially complied with those requirements.

The reviewers considered the information Plaintiffs provided. For example, the first and second denial letters cited Plaintiffs' appeal letters (which included Second Nature's treatment records, the 2014 Psychological Report, and letters of medical necessity), case notes, and medical records. The external reviewer listed, among other things, Charlie's medical records, the 2014 Psychological Report, appeal information, the denial letters, correspondence, and the Summary Plan Description.

All reviewers provided reasons for denial, referred to Charlie's circumstances, and articulated their clinical judgments. Dr. Satten explained, "In treatment your child did not have withdrawal symptoms. Your child's behavior was good. Your child was engaged in treatment. Your child did not require 24-hour per day monitoring and he could have been treated at a lower level of care." (AR 4860.) Dr. Moldauer concluded that the clinical data were insufficient to support a finding of medical necessity for the treatment Charlie received at Second Nature.

Charlie was "compliant with treatment.  He did not have any emotional dysregulation or behavior problems.  He was not dangerous to self or others.  He did not require[] 24-hour per day monitoring and could have been treated at a lower level of care."  (AR 537.)  The external MCMC reviewer wrote that "[r]ecords from the program indicate that the patient was compliant with the treatment milieu, activities and protocols.  The program records indicate that the patient required work around anger and blame externalization.  He also worked on substance use issues.  The treatment was wilderness therapy."  (AR 5095.)  In the denial, the external reviewer concluded, just as the earlier reviewers did, that treatment in Second Nature's wilderness program was not medically necessary.

That the reasons were not as specific as Plaintiffs would like or that the reviewers did not cite to specific portions of the record is not a violation of ERISA's requirements.  A plan administrator must consider the information, but the ERISA regulations do not require affirmative responses to the arguments made on appeal.  See 29 C.F.R. § 2560.503-1(h)(2)(iv) (requiring "review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination") (emphasis added); Mary D. v. Anthem Blue Cross Blue Shield, 778 F. App'x 580, 589–90 (10th Cir. 2019) ("[A]lthough [plaintiff] asserts that she requested responses to the materials and arguments she submitted, she doesn't cite any authority—nor are we aware of any—that required Anthem and the Benefits Committee to affirmatively respond to these submissions.") (emphasis in original).

The reviewers cited portions of the Plan they found most relevant.  All reviewers found the treatment was not medically necessary, which of course is a Plan requirement.  (See AR 105, 230, 356 (Plan document defining "Covered Health Service" as a service that UHC determines to

be, among other things, "Medically Necessary").)  The UBH reviewers cited the Plan's

Substance Use Disorder Guideline.  The external reviewer cited generally accepted standards of

medical practice as well as the Plan's definition of "Medically Necessary."

The reviewers were qualified.  Dr. Moldauer, board certified in psychiatry, attested in

UBH case notes to having "(a) A scope of licensure or certification that typically manages the

medical condition, procedure, treatment, or issue under review; and (b) Current, relevant

experience and/or knowledge to render a determination for the case under review."  (AR 506.)

Dr. Satten did the same.  (AR 510.)  The external reviewer provided the most specific description

of credentials:

> I am board certified in Psychiatry with subcertification in Child & Adolescent
> psychiatry.  Currently, I am an attending staff Psychiatrist at several hospitals
> located in the Northeast.  I am also a clinical Instructor.  My areas of expertise
> include all psychiatric disorders, forensic psychiatry, and child & adolescent
> psychiatry.  I am published in the peer reviewed medical literature and I am a
> member of the American Academy of Child and Adolescent Psychiatry,
> American Psychoanalytic Association, and Academy of Occupational and
> Organizational Psychiatrists.

(AR 5097.)

Given the above, the court finds that UBH's treatment of Plaintiffs' claims and appeals

substantially complied with ERISA's procedural requirements.

### c.  New Basis for Denial

According to Plaintiffs, UBH improperly raised a new reason for denial—a "wilderness

exclusion"—in Dr. Goldberg's decision rejecting Plaintiffs' last internal appeal.  They assert this

violated ERISA's procedural guidelines because they did not have an opportunity to respond.

The record shows otherwise.

First, UBH's internal reviewers as well as the external reviewer cited reasons of medical

necessity, which included the wilderness focus of Second Nature's program.  (See AR 504–07,

511–13, 536–37, 4548–49, 5063–72.)  Dr. Goldberg, who specifically raised the wilderness

issue, cited medical necessity and noted that Second Nature's wilderness program did not

provide "medically directed treatment."  (AR 5064.)  Furthermore, the Tenth Circuit has rejected

the argument that "'shifting' and 'inconsistent' reasons" in the defendants' denial letters merit de

novo review when all of the claims administrator's decisions "denied benefits based on medical

necessity."  Mary D., 778 F. App'x at 588.  The same reasoning applies here.

 Second, Plaintiffs did have an opportunity, and took advantage of that opportunity, to

respond when they filed an external appeal.  In those documents, they discussed the wilderness

denial rationale.

 Finally, even if, for the sake of argument, Dr. Goldberg's denial was a procedural

irregularity, it did not prejudice Plaintiffs.  An irregularity that does not have material

consequences does not merit de novo review.  See Gilbertson, 328 F.3d at 635 ("in the context of

an ongoing, good faith exchange of information between the administrator and the claimant,

inconsequential violations of the deadlines or other procedural irregularities would not entitle the

claimant to de novo review").

 For all the reasons set forth above, the court will apply the arbitrary and capricious

standard of review to UBH's denial of coverage for Charlie's treatment at Second Nature.

**Review of UBH's Denial**

 Four doctors, including one not associated with UBH, independently concluded that

Charlie's treatment at Second Nature was not medically necessary and that he could have been

treated at a less intensive level of care.  Given the consistent conclusions of multiple experts who

reviewed the same record Plaintiffs cite here, Plaintiffs are fighting an uphill battle to convince

the court that UBH's decision was "not grounded on any reasonable basis."  Kimber v. Thiokol

Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (emphasis in original), quoted in Tracy O. v.

Anthem Blue Cross Life & Health Ins., 807 F. App'x 845, 854 (10th Cir. 2020).

To uphold UBH's decision, the court must find the record contains substantial evidence

to support the denial.  The Tenth Circuit defines "substantial evidence" as "'more than a

scintilla' of evidence 'that a reasonable mind could accept as sufficient to support a conclusion.'"

Eugene S. v. Horizon Blue Cross Blue Shield of N.J., 663 F.3d 1124, 1134 (10th Cir. 2011)

(quoting Adamson, 455 F.3d at 1212).  The consistent determinations of four qualified reviewers

satisfy that standard.

### a.  Dual Diagnosis

Plaintiffs assert, as a substantive challenge to UBH's decision, that the reviewers did not

consider Charlie's dual diagnosis.  As noted above, the court finds they did.  Accordingly, that is

not a reason to overturn UBH's denial of Plaintiffs' claim.

### b.  Treating Clinicians

Plaintiffs assert that Charlie's treatment at Second Nature was medically necessary.  In

support, they point to information provided by professionals who either treated or evaluated

Charlie before he enrolled in Second Nature's wilderness program.  They rely on Greg

Carbone's 2014 Psychological Report.  They also cite three letters of medical necessity.  Two of

Charlie's former therapists—William Strong, LCSW, and Patrick Cole, MSW and LCSW—

submitted letters, as did Plaintiffs' educational consultant Robert Meltzer, who has a Master's

degree in Counseling Psychology.

Plaintiffs contend the reviewers arbitrarily discounted, or disregarded altogether, the

credible conclusions of those professionals who were closest to Charlie.  The court disagrees.

The reviewers did consider that information, as they indicated in their review notes and decision

letters.  Although they did not specifically address the opinions in their denial decisions, the law does not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  Moreover, the law does not require a plan administrator to give special deference to opinions of the patient's treating physicians. Id. at 825 (rejecting a treating-physician rule in ERISA cases).  The law simply holds that a plan administrator may "not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id. at 834.

The content of the 2014 Psychological Report and the three letters do not necessarily lead to the conclusion that Charlie's treatment at Second Nature was medically necessary at the relevant time.

The letters of medical necessity assess Charlie's condition at least four to five months before Charlie attended Second Nature.  Mr. Strong's July 11, 2012 letter pre-dated Charlie's treatment at Second Nature by two and a half years.  Mr. Cole issued his August 2, 2014 letter five months before Charlie's January 2015 enrollment at Second Nature.  Similarly, Mr. Meltzer made his recommendation based on information he obtained during the period of February 2013 through August 2014.

Dr. Carbone issued his report on August 20, 2014, four months before Charlie enrolled at Second Nature.  Charlie came to him "for evaluation in the context of a short-term residential treatment placement" at Summit.  (AR 5007, 5014.)  The report described Charlie's overall psychological profile and recommended future treatment and educational accommodations for Charlie upon his discharge from Summit's around-the-clock wilderness treatment program.  Dr. Carbone wrote that Charlie

25

> is expected to require continued structure and support for an extended period, both of which should be tailored to his learning profile and implemented by a professional staff with experience in helping adolescents who present with the combination of academic, neurocognitive, social, and behavioral difficulties outlined [in the report]. … [H]e will also require continued interventions, following his discharge from Summit, that can address his learning and therapeutic needs while preventing a return to the problematic behavior that precipitated his admission to Summit.

(AR 5017.)  He listed Charlie's need for "substantial external structure," psychotherapy, close monitoring, immediate interventions, substance abuse treatment, and accommodations to overcome academic weaknesses.  (AR 5017–18.)  Notably, he does not recommend that Charlie enroll in another inpatient treatment program.  In fact, he apparently issued the recommendations based on his understanding that Charlie was to be discharged from an inpatient treatment program.

Diagnoses and clinical observations do not equal a medical necessity determination under the terms of a benefits plan.  See Eugene S., 663 F.3d at 1135 (agreeing with plan administrator's argument that "[a] psychiatric diagnosis is entirely different from a medical necessity determination").  The Plan provides benefits for a "Covered Health Service," which requires, among other things, that the treatment be medically necessary and fall outside the Plan's list of exclusions.  Those exclusions bar coverage if the treatment is not consistent with generally accepted standards of medical practice, not backed by credible research, not consistent with the Plan's LOC guidelines, or not clinically appropriate.  (AR 58, 187–88, 314.)

The opinions and clinical information in the letters of medically necessity and the 2014 Psychological Report offer one data set.  They do not address all the factors the reviewers had to consider when making a coverage determination,[11] nor do they address the subsequent medical records Second Nature generated during Charlie's stay.  The reviewers reached a conclusion

---

[11] The Plan's definitions of "covered health service" and "medically necessary" have multiple parts.  (See AR 105, 108, 230, 233, 356, 359.)

contrary to the conclusion Plaintiffs draw from the treating clinicians' writings, but that is not evidence that the reviewers disregarded those opinions.

### c.  External Reviewer

Plaintiffs challenge the final decision by the MCMC reviewer, who they say "failed to address Charlie's actual medical conditions and discounted the treatment at Second Nature." (Pls.' Opp'n to Defs.' Mot. Summ. J. at 30, ECF No. 59.)  They also contend the reviewer "ignored the peer review studies that the family provided to demonstrate the effectiveness of longer term treatment at a program like Second Nature."  (Id.)

MCMC's highly qualified physician reviewer independently evaluated the entire record. The reviewer, who considered Charlie's dual diagnosis, based the decision on generally accepted standards of medical practice.  In addition to the conclusion that Charlie's treatment was not consistent with those standards, the reviewer also stated that Charlie's treatment was "not consistent with research soundly showing measurable and beneficial health outcome" and was "not clinically appropriate in terms of site and duration and intensity[.]"  (AR 5095–96.)

Nothing Plaintiffs provide undermines the external reviewer's independent expert judgment.  Given the record and the deferential standard of review, the court will not second-guess the result.

### d.  Conclusion

Ultimately, UBH's decision "need not be the only logical or even the best decision." Rademacher, 11 F.3d at 1570.  Four qualified medical experts concluded that Charlie's treatment at Second Nature was not medically necessary.  Considering the record and applying the deferential review, the court cannot find that UBH's decision was "not grounded on any reasonable basis," and, accordingly, will not "substitute [its] judgment for the judgment of the

[administrator.]"  Kimber, 196 F.3d at 1098 (emphasis in original), quoted in Tracy O., 807 F.

App'x at 854; Woolsey, 934 F.2d at 1460.  Because the court concludes that substantial evidence

supports UBH's decision, the court denies Plaintiffs' request for coverage of Charlie's treatment

at Second Nature.

## IN BALANCE RANCH ACADEMY

After his discharge from Second Nature, Charlie's parents sent him to In Balance Ranch

Academy ("Ranch Academy") on March 28, 2015.  He stayed there for seventeen months and

left on August 17, 2016.

Ranch Academy is apparently part of an entity oftentimes referred to as "In Balance."  In

Balance offers two treatment options: (1) an outpatient counseling service, called In Balance

Counseling, and (2) the residential treatment program provided by Ranch Academy.  Although

the record is not entirely clear, it appears Charlie received services from both.

The terms "In Balance," "In Balance Counseling," and "In Balance Ranch Academy" are

used throughout the documents, sometimes interchangeably.  The blurring of those lines had

material consequences under the Plan's terms.  In Balance Counseling is an in-network provider

and had a contract with the Plan, which set terms of payment and scope of reimbursable claims.[12]

But the claims here concern Charlie's treatment at Ranch Academy, an out-of-network provider.

**Charlie's Claim for Coverage**

The entity "In Balance Counseling Inc." submitted claims for treatment costs that

Plaintiffs incurred for Charlie's treatment at Ranch Academy between March 2015 and August

---

[12] The Plan provides that "Eligible Expenses" are "the amount the Plan will consider paying for
Covered Health Services, incurred while the Plan is in effect."  (AR 106, 231, 357.)  Eligible
expenses for in-network benefits "are the contracted fee(s) with that provider."  (Id.)

2016.[13]  UBH denied the claims.

In its Explanation of Benefits, UBH lists the "Provider" as "In Balance" and treats the Provider as the in-network provider In Balance Counseling.  UBH articulated a series of reasons for the denials: (1) the Provider had "no contractual allowance for this service"; (2) the Provider did not submit the claims on time; and (3) the Provider did not give UBH advance notice of the treatment.[14]

On July 26, 2016, Charlie's mother filed a level one appeal in which she challenged the denials of coverage for inpatient treatment by what she referred to as "In Balance Ranch Academy."  (AR 4119.)  She focused on UBH's second and third reasons for denial: untimeliness and failure to obtain pre-authorization.  When UBH notified Charlie's mother that UBH had received the appeal letter, it listed "In Balance Counseling, Inc." as the Provider.

UBH upheld the decision on March 14, 2017.  In the denial letter, UBH's Clinical Appeals Reviewer Kathleen Gray wrote that the services provided by "In Balance Counseling" were "not eligible for payment" because "In Balance Counseling is not contracted for the service of supervised/transitional living, revenue code 1003."  (AR 4397.)

Charlie's mother then filed a level two appeal on May 13, 2017.  In her letter, she did not disagree with the denial rationale (that is, that In Balance Counseling did not have a contract to provide inpatient services).  Instead, she wanted to explain a billing mistake.  Unfortunately, her explanation was not clear.

---

[13] See AR 563-630 (showing claims submitted by "Provider NM: In Balance Counseling Inc."); Uniform Billing forms, AR 732, 1014, 1296, 1860, 2142, 2424, 2706 (showing "In Balance Counseling Inc." submitting claims for "Transitional/Supv'd Care R&B BH").
[14] See AR 632, 636, 640, 644, 648, 652, 656, 664, 668, 672, 676, 680-82, 686, 690, 694, 698, 702.

She wrote, "There are two separate entities under consideration with this denial and this course of treatment.  One, In Balance Ranch, provides mental health services at an alternate level of care …. The second, In Balance Counseling, provides therapeutic services at an outpatient level of care."  (AR 4410.)  She described an "error" in billing: "[T]he services Charlie received were billed under interim claims.  This was done in error, and I am actively working to resolve this issue."  (Id. (emphasis added).)  From what the court can gather (and the record is not altogether clear), Charlie's mother suggested that at least some claims had not yet been filed: "As In Balance Ranch provides treatment as an inpatient alternative facility, these claims will be considered timely."  (Id. (emphasis added).)  She may have been referring to her argument that claims that would otherwise be considered late (because more than one year had passed) were viable because the "legally incapacitated" exception nullified that deadline.

Apparently, she was not able to submit official bills from Ranch Academy at that time, so she offered in their place a spreadsheet she had generated which listed the monthly charges for Charlie's treatment at Ranch Academy.  (See id. ("In absence of the ability to generate [billing forms], accept this spreadsheet as providing my notice of loss, in the amount of $115151.07.  These services should be considered similar to the services provided by a residential treatment facility.") (emphasis added).)  Ultimately, she insisted that UBH "must reprocess these claims under the plan's coverage for mental health and substance use services received from an alternate facility."  (AR 4411.)

Despite Plaintiffs' contention that an error had occurred, UBH Clinical Appeals Reviewer Tina Kelsey upheld denial of the claims for the same reason Kathleen Gray provided:  "Per Optum claims processing system[,] this claim was appropriately processed.  The provider has no contract for Revenue Code 1003 which is supervised/transitional living."  (AR 4436.)  But the

reviewer added the following comment: "No further payment will be issued without a corrected claim submission to warrant further reconsideration." (Id.)

Plaintiffs challenge UBH's handling and denial of claims arising out of Charlie's seventeen-month stay at Ranch Academy. To them, UBH incorrectly denied the claims based on a billing error and should have reviewed the substance of the claims to find that Charlie's treatment was medically necessary. Accordingly, they ask this court to determine independently that Charlie's treatment was medically necessary and covered by the Plan.

**Standard of Review**

Plaintiffs assert the court must apply the de novo standard of review based on Defendants' alleged failure to comply with ERISA's legal requirements during the claims review process. Plaintiffs blame UBH for "erroneously characteriz[ing] the inpatient transitional services provided by the Ranch Academy to outpatient services provided by In Balance Counseling, Inc." and contend that UBH ignored their explanation of the mistake in their appeals. (Pls.' Opp'n to Defs.' Mot. Summ. J. at 19.)

As discussed below, the court finds that UBH did not mistakenly characterize the claims and did not ignore Plaintiffs' discussion about the difference between In Balance Counseling and In Balance Ranch Academy. Accordingly, the court applies the arbitrary and capricious standard of review. But even under a de novo standard of review, the court finds that UBH's decision was correct.

**Denial of Benefits**

Neither Plaintiffs nor Ranch Academy submitted claims for Charlie's inpatient treatment at Ranch Academy. In Balance Counseling did, but the record shows it identified itself in its claim submissions as the provider. Moreover, it did not tell UBH that Ranch Academy provided

31

the inpatient services.  As a result, UBH inevitably denied the claims because it did not have an agreement to pay In Balance Counseling for inpatient services.  This, say the Plaintiffs, was unreasonable.

From UBH's perspective, the decision was reasonable.  As the Plan expressly provides, UBH denies claims from an in-network provider when that provider submits claims for services not covered by the provider's network contract.

Plaintiffs do not dispute that requirement.  But they also argue that it does not apply because In Balance Counseling did not provide the services.

The difficulty is that neither Plaintiffs nor In Balance (whether that be the umbrella entity, or In Balance Counseling, or Ranch Academy) filed corrected claims.  Instead, they chose to rely on the appeal process to fix In Balance Counseling's mistake.

To complicate matters further, Plaintiffs did not note the distinction between In Balance Counseling and Ranch Academy in their level one appeal letter.  At that point, UBH had no information to suggest it had incorrectly denied the claim based on lack of contractual allowance.

Certainly Plaintiffs explained the difference in their second level appeal letter.  But they did nothing more than attach a simple, one-page spreadsheet listing the cost per day for the entire time Charlie was under In Balance Ranch Academy's care and then ask UBH to accept that as evidence of the "loss."  In short, Plaintiffs did not file a proper claim even though UBH gave them the chance to do so.

UBH, in its brief letter denying Plaintiffs' level two appeal, told Plaintiffs that "[n]o further payment will be issued without a corrected claim submission to warrant further reconsideration."  (AR 4436.)  That statement notified Plaintiffs that they had an opportunity to re-submit their claim.  The record does not contain evidence that Plaintiffs, In Balance

Counseling, or In Balance Ranch Academy did so.  As Defendants observe in their briefs, UBH "can only review and adjudicate claims based on the claim information provided with the claim submission." (Defs.' Reply in Support of Mot. Summ. J. at 19, ECF No. 65.)

The record supports UBH's denial decision.  Given the Plan's express terms, the bills that In Balance Counseling submitted, and the undisputed scope of UBH's contract with In Balance Counseling, the court concludes that UBH's denial was de novo correct.  Accordingly, the court affirms UBH's decision to deny Plaintiffs' claims for Charlie's treatment at In Balance Ranch Academy.

## **ORDER**

For the foregoing reasons, the court GRANTS Defendants' Motion for Summary Judgment (ECF No. 53) and DENIES Plaintiffs' Motion for Summary Judgment (ECF No. 54.)

DATED this 24th day of September, 2021.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge